Petition of Jacinto JERONIMO, also known as Jerry Jerome, Petitioner,

v.

John L. MURFF, as District Director of Immigration and Naturalization for the District of New York, Respondent.

United States District Court
S. D. New York.
Dec. 6, 1957.

Newman, Aronson & Neumann, New York City, for petitioner, Mannis Neumann, New York City, of counsel.

Paul W. Williams, U. S. Atty., for the Southern Dist. of New York, New York City, for respondent, Roy Babitt, Sp. Asst. U. S. Atty., and Gen. Atty., Immigration & Naturalization Service, New York City, of counsel.

HERLANDS, District Judge.

The Government has moved for summary judgment (Fed.Rules Civ.Proc. rule 56, 28 U.S.C.A.) dismissing the complaint as a matter of law, on the ground that there is no issue of material fact, that all administrative proceedings heretofore had have been proper in all respects, and that the finding of the petitioner's deportability is proper.

The petition [1] challenges the validity of an order of deportation for the as-

---

1. The petition, filed November 9, 1955, contains the following recitals:

(1) On or about October 7, 1954 a hearing was conducted at Auburn State Prison by a Special Inquiry Officer, of the Immigration & Naturalization Service, to determine whether the petitioner should be deported.

(2) At the hearing, there was read into evidence an eight-count indictment against the petitioner in the Court of General Sessions, of the County and State of New York, for the offenses of conspiracy, grand larceny, and bribery. The evidence put into the hearing record showed that, on April 4, 1950, the petitioner had been convicted and sentenced on each of the seven counts.

(3) At the hearing, the petitioner contended that all of the convictions arose out of a single scheme of criminal misconduct. This contention was overruled by the hearing officer "solely on the ground that each grand larceny count in the indictment covered a separate contract at a separate place within the

serted reason that the petitioner does not come within a deportable class, as defined by the controlling statute. 8 U.S.C.A. § 1251(a) (4), Immigration and Nationality Act, § 241(a) (4).

In support of its motion for summary judgment, the Government has submitted to the Court the entire administrative record (Exhibit "A").

As stated in the Government's moving affidavit (para. 7): "The sole issue raised in the complaint is an issue of law, to wit, whether or not as a matter of law the Immigration and Naturalization Service was correct in concluding that the crimes for which petitioner was convicted did not arise out of a single scheme of criminal misconduct." Petitioner, in his opposing affidavit (para. 4), concludes: "I join with the government in requesting a determination of the legal questions involved."

The relevant part of the controlling statute, 8 U.S.C.A. section 1251(a) (4), provides:

"Any alien in the United States * * * shall, upon the order of the Attorney General, be deported * * who at any time after entry is con-

victed of *two crimes* involving moral turpitude, *not arising out of a single scheme of criminal misconduct,* regardless of whether confined therefor and regardless of whether the convictions were in a single trial * * *." (Emphasis supplied.)

The precise and sole point of controversy is whether the larcenies (on which the Government relies for deportation purposes) arose "out of a single scheme of criminal misconduct."

The administrative record (Exhibit "A") discloses that a hearing was held on September 28, 1954 at Auburn State Prison, Auburn, New York. The record of that hearing consists of a stenographic transcript of ten pages and ten exhibits.[2] The petitioner waived the right to counsel at the hearing.

Exhibit "1" introduced at the September 28, 1954 hearing was a copy of the warrant of arrest, issued on July 1, 1954, and served on July 30, 1954. The warrant recites, *inter alia,* as the reason for deportation, that Jeronimo, after entry, had been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct,

City of New York, and that as such they necessarily arose out of a separate scheme of criminal misconduct" (petition, para. 7).

(4) On or about October 7, 1954, the Special Inquiry Officer rendered his decision and order providing that the petioner be deported. The determination in the decision was that the petitioner was deportable in that the petitioner had been convicted of two crimes, after entry into the United States, involving moral turpitude and not arising out of a single scheme of criminal misconduct.

(5) Thereafter, exceptions to the decision and order were duly filed. An appeal was duly prosecuted. On or about December 3, 1954, the Board of Immigration Appeals dismissed the appeal.

(6) On or about September 15, 1955, the petitioner applied to the Board of Immigration Appeals for a new hearing "in order that his testimony might be taken to show that the crimes charged in the indictment arose out of a single scheme of criminal misconduct" (petition, para. 12).

(7) The petitioner's application was denied by the Board of Immigration Appeals on October 26, 1955.

The petition prays that this Court review the order of the Board of Immigration Appeals; declare the decision and order of the Hearing Officer to be null and void; and "issue a temporary injunction staying the execution of the aforesaid order of deportation pending final determination of the issues of this action by this Court."

2. The following biographical facts were established: Jeronimo (now fifty-two years old) was born in the Azores and entered the United States in 1921. Since 1921, he has never left the United States. He married twice in this country. He has two children by his first wife, and one child by his present wife. His children and wife are living in the United States.

He applied for his first papers in 1923, but he never took out his second papers.

During 1943 and 1944, he served in the United States Army. He was honorably discharged.

"to wit. Grand Larceny, 1st (four separate offenses)." When precisely the same ground was incorporated in a question by the Special Inquiry Officer, Jeronimo answered, "Yes, it is only one scheme" (transcript, p. 2).

The indictment (Exhibit "7") and the convictions and sentences thereunder (Exhibit "8") disclose that an eight-count indictment was filed on October 13, 1949 against Jeronimo (as "Jerome") and two others and that Jeronimo was found guilty of six counts by a jury on April 4, 1950, viz. counts 1, 2, 3, 5, 7 and 8; and that he was sentenced on April 27, 1950.[3]

The first count of the indictment charges "conspiracy." The second, third, fifth and seventh counts charge "grand larceny in the first degree." The fourth, sixth and eighth counts charge "bribing a public officer." (The second, third, fifth and seventh larceny counts are the counts relied on by the Government herein for deportation purposes.)

The first count fixes the period of the conspiracy as "from on or about March 1, 1947 and *continuously* up to on or about January 7, 1949." (Emphasis supplied.) It alleged that the defendants "*conspired * * * to commit the crimes of* bribing a public officer, *grand larceny in the first degree * * *.*" (Emphasis supplied.) The conspiracy consisted of a scheme or plan to defraud the City of New York by making false and fraudulent claims for payments for labor and materials supplied to the City under contracts between the City and the corporate defendant, J. & B. Contracting Co., Inc., for painting the interior surfaces of various municipal buildings. Jeronimo and another defendant, Sam Lemkin (who were stockholders and officers of the corporate defendant) "agreed and planned" that the corporate defendant should submit bids

for contracts to the Department of Hospitals of the City of New York for painting the interior surfaces of various buildings under its jurisdiction.

Part of the conspiracy was that the corporate defendant should submit false vouchers and requests for payments to the municipal authorities in order to represent that the corporate defendant was supplying and had supplied the labor and painting materials in conformity with the contract specifications, whereas the corporate defendant was not supplying, had not supplied and never intended to supply the proper labor and materials.

A further part of the conspiracy entailed the bribing of one Bolfe, and inspector employed by the Department of Hospitals, in order to get him to approve the work to be performed by the corporate defendant at the Metropolitan Hospital, and to approve the defendants' request for payments for work which was to be performed.

This conspiracy count then sets forth nine "overt acts" in "furtherance of said conspiracy and to effect the objects thereof."

Overt act "1," refers to the date "on or about April 28, 1947" in connection with a request for partial payment under "Contract #149122." (Note that the date and the contract number correspond with the date and contract number in the second count, a substantive larceny count.)

Overt act "2" refers to the submission of an estimate in the aggregate amount of "$39,310.74" under "Contract #149122." (Note that the amount and the contract number correspond precisely with the amount and the contract number in the Second Count, a substantive larceny count.

Overt act "3" refers to the date "on or about January 27, 1948" in connection

---

3. Jeronimo was sentenced as follows: suspended sentence on the first count; five to ten years on the second, third, fifth and seventh counts, to run concurrently; and two and one-half to five years on the eighth count, to run consecutively with the sentences on the second, third, fifth and seventh counts.

The conviction was affirmed. People v. Jerome, 1953, 282 App.Div. 758, 122 N.Y.S.2d 667; 1954, 306 N.Y. 777, 118 N.E.2d 599.

with a request for partial payment under "Contract #151035." (Note that the date and contract number correspond with the date and contract number in the Third Count, a substantive larceny count.)

Overt act "4" refers to a request for payment under "Contract #151035." (Note that this contract number corresponds with that in the Third Count, a substantive larceny count.)

Overt act "5" refers to the date "on or about June 18, 1948" in connection with a request for partial payment under "Contract #152930." (Note that the date and contract number correspond with the date and contract number in the Fifth Count, a substantive larceny count.)

Overt act "6" refers to a request for payment under "Contract #152930." (Note that this contract number corresponds with that in the Fifth Count, a substantive larceny count.)

Overt act "7" refers to the date "on or about October 15, 1948" in connection with a request for partial payment under "Contract #153014." (Note that the date and contract number correspond with the date and contract number in the Seventh Count, a substantive larceny count.)

Overt act "8" refers to a request for payment under "Contract #153014." (Note that this contract number corresponds with that in the Seventh Count, a substantive larceny count.)

The Second Count (grand larceny in the first degree) covers the period "from on or about April 28, 1947, to on or about October 8, 1948"; involves the aggregate amount of $39,310.74; and refers to Contract #149122 with the Commissioner of Hospitals, covering painting to be done in "various buildings in the City Home District, Welfare Island."

The Third Count (grand larceny in the first degree) covers the period "from on or about January 27, 1948, to on or about September 10, 1948"; involves the aggregate amount of $43,981.27; and refers to Contract #151035 with the Com-

missioner of Hospitals covering painting to be done at the Farm Colony, West New Brighton, Staten Island.

The Fourth Count (bribery) covers the period "from on or about February 9, 1948, to on or about September 10, 1948"; and involves a bribe paid to Inspector Bolfe of the Department of Hospitals in connection with the defendants' work under the contract mentioned in the Third Count.

The Fifth Count (grand larceny in the first degree) covers the period "from on or about June 18, 1948, to on or about December 13, 1948"; involves the aggregate amount of $52,498.65; and refers to Contract #152930 with the Commissioner of Hospitals covering painting to be done at the Metropolitan Hospital, Welfare Island.

The Sixth Count (bribery) covers the period "from on or about June 7, 1948, to on or about December 13, 1948"; and involves a bribe paid to Inspector Bolfe in connection with the defendants' work under the contract mentioned in the Fifth Count.

The Seventh Count (grand larceny in the first degree) covers the period "from on or about October 15, 1948, to on or about January 7, 1949"; involves the aggregate amount of $15,761.60; and refers to Contract #153014 with the Commissioner of Hospitals covering painting to be done at the Willard Parker Hospital.

The Eighth Count (bribery) covers the period "from on or about September 13, 1948, to on or about January 7, 1949"; and involves a bribe paid to Inspector Bolfe in connection with the defendants' work under the contract mentioned in the Seventh Count.

The following important observations must be made:

(1) The period of time charged in the First Count (conspiracy)—"from on or about March 1, 1947, and continuously up to on or about January 7, 1949"— completely encompasses the periods of time of the acts charged in every one of the other counts in the indictment.

(2) The contracts mentioned in each of the substantive counts are with the Department of Hospitals, a subject-matter falling squarely within the scope and objectives of the conspiracy.

(3) The acts and transactions mentioned in the substantive counts are correlated with specific overt acts pleaded in the conspiracy count, which acts are (as noted) in furtherance of the same conspiracy.

(4) Any conceivable doubt as to the actual connection and interrelationship of the acts charged in the substantive counts with those charged in the conspiracy count is laid to rest by the concluding paragraph of the indictment, which reads:

"All of the acts and transactions alleged in each of the several counts in this indictment are connected together and constitute parts of a common scheme and plan."

This explicit statement—made by the Grand Jury on the basis of the evidence before it—takes on even greater significance in light of the provisions contained in New York Code of Criminal Procedure, section 279. Under that section, different counts may be joined in one indictment, where there are two or more acts or transactions constituting crimes of the same or similar character, notwithstanding the fact that such acts or transactions are not part of a common scheme or plan. In this case, however, the conspiracy, larceny and bribery counts were joined in the one indictment because the Grand Jury expressly found: (1) that *all* of the acts and transactions alleged in the indictment are *connected together* and (2) that all of such acts and transactions constitute *parts of a common scheme and plan.*

It must be kept in mind that the Government itself relies solely upon the indictment and the record convictions thereunder. No extrinsic proof was introduced by the Government at the administrative hearing (Exhibit "A") on the issue whether Jeronimo's four larcenies arose out of a single scheme of criminal misconduct. Nor does the Government now suggest or intimate that it has other proof or desires the opportunity to secure or adduce such other proof. The Government's case, therefore, stands or falls upon the present record.

Upon the record (Exhibit "A"), the Special Inquiry Officer, under date of October 7, 1954, decided that the "four separate counts" of grand larceny in the first degree did not arise out of a single scheme of criminal misconduct. This decision is based solely upon the conclusory assertion that each count "arose out of a separate scheme of criminal misconduct."

In dismissing the appeal on December 3, 1954, the Board of Immigration Appeals likewise made the following conclusory statement:

"The counts in the indictment on which the respondent was convicted disclose that each count was a separate offense and arose out of a separate scheme of criminal misconduct."

The evidence in the record conclusively establishes that the four larcenies upon which the proposed deportation is based arose out of a single continuing criminal enterprise.

Considering the total record, the Court is of the opinion that there is no substantial evidence on the basis of which a contrary finding may rationally be made. While the indictment contains eight separate counts and Jeronimo was sentenced on each of six of the counts, the indictment and his convictions thereunder demonstrate that Jeronimo engaged in a single criminal plan—a project that he launched "on or about March 1, 1947" and then carried forward "continuously up to on or about January 7, 1949"—and that all of his acts and transactions, as described in the indictment, were closely "connected together" constituting the "parts" of one "scheme and plan."

The Government's main argument appears to be the following (respondent's memorandum, p. 12): (1) Separate crimes do not arise out of a single scheme

of criminal misconduct unless the crimes are committed "pursuant to a single sustained criminal impulse." (2) Each of the four larcenies herein was "the result of a separate independent impulse." (3) Therefore, the four larcenies did not arise out of a single scheme of criminal misconduct.

The fallacy in the Government's major premise is that it erroneously prescribes "a single sustained criminal impulse" as the condition precedent to the existence of a single scheme of criminal misconduct. There is risk of reducing the discussion to a quodlibet by attempting to equate a "single scheme of criminal misconduct" with one all-important subjective fact.

Nor do the cases cited by the Government sustain its present position. Fitzgerald ex rel Miceli v. Landon, 1 Cir., 1956, 238 F.2d 864; Chanan Din Khan v. Barber, D.C.N.D.Cal.1957, 147 F.Supp. 771. These decisions [4] are clearly and

---

4. In Fitzgerald ex rel. Miceli v. Landon, supra, the Court affirmed the dismissal of a petition for a writ of habeas corpus in a deportation case where the record was "very meager" (238 F.2d at page 864). Chief Judge Magruder took pains to point out: (1) "It nowhere appears that petitioner sought, and was denied, an opportunity to present evidence to the court below" (238 F.2d at page 865). (2) "The transcript of the administrative proceedings had not been appended as an exhibit to the return, nor did petitioner offer in evidence a certified copy thereof. Therefore the district court did not have before it the record of the administrative proceedings, including a transcript of the evidence presented to the Special Inquiry Officer, on the basis of which Miceli was order to be deported on the charge contained in the Warrant of Arrest. All the district court had before it was the petition for the writ, and respondent's return to the order to show cause" (238 F.2d at page 865). (3) "The evidence on the basis of which" the alien was convicted of one of the two crimes involved "is not before us" (238 F.2d at page 867). (4) The Government's return to the alien's order to show cause averred that the Special Inquiry Officer's decision was based on substantial evidence. "That evidence, the substance of which we do not know, might well have been adequate to sustain the finding that the two offenses of which Miceli was convicted did not arise 'out of a single scheme of criminal misconduct.'" (238 F.2d at page 867)

It appeared that a local police chief had filed two complaints, on November 2, 1953, against the alien, Miceli. The first complaint charged that, on October 23, 1953, Miceli had committed an indecent assault and battery on a young child. Such conduct was made a crime by virtue of a 1953 statute. The second complaint charged that, on October 23, 1953, and during a three-month period preceding the filing of the complaint, Miceli was "a lewd, wanton or lascivious person in speech or behavior." This crime, under a long-standing statute, consisted of "being a certain kind of person, not doing a certain overt act" (238 F.2d at page 866).

Miceli was tried for both crimes at one trial; and was convicted and sentenced. Judge Magruder reasoned (238 F.2d at page 866) that "it is certainly not necessarily true" that the two crimes "must have arisen 'out of a single scheme of criminal misconduct'" because, under Massachusetts law, it was unlikely that Miceli had been convicted under the second complaint (i. e., being a lewd person) solely on the basis of the one act of indecent assault on the single occasion charged in the first complaint. If, however, Miceli had been so convicted, Judge Magruder said: "What our decision would be, on the issue of deportability in such a situation, it is not necessary now to decide" (238 F.2d at page 866).

In the course of his opinion, Judge Magruder pointed out that proof of a "single scheme" requires something more than evidence of the use of "the same technique and pattern of conduct" (238 F.2d at page 867). It requires proof of "a single criminal enterprise" (238 F.2d at page 865).

In Chanan Din Khan v. Barber, supra, the alien was convicted for wilfully attempting to evade the payment of Federal income tax for the year 1946 and, in the same prosecution, for committing the same offense twelve months later in connection with the income tax due for the year 1947. The Court held that the two crimes did not arise out of a "single scheme of criminal misconduct" within the meaning of 8 U.S.C.A. section 1251(a) (4) because: (1) the two crimes were not committed by the doing of a series of "closely connected acts" (147 F.Supp. at page 774); (2) in point of time and duration, the crime of at-

sharply distinguishable from the case at bar.

■ The statute uses the words "a single scheme of criminal misconduct" in a colloquial sense. These words must be construed in their usual acceptation, in common language, since they are not defined by law. The word "scheme" covers a wide spectrum of meaning. According to the dictionary, it may mean a plan of something to be done; a project; a plot or device for the accomplishment of an object; a combination of various things according to a systematic plan. Moreover, the words "criminal misconduct" are generic and non-technical.

■ The statute reads: "not arising out of a single scheme of criminal misconduct." It does not read: "not arising out of a single act or single transaction." The words "not arising out of" mean not occurring in the course of the performance of the single scheme.

The statute does not point to any one element of evidence as the vital and all-determining factor. It is necessary to distinguish between one or more evidentiary facts tending to prove or disprove the singleness of the scheme and the ultimate statutory fact. In a particular situation, the circumstance that the defendant committed a number of different crimes at or about one time as the result of the same criminal impulse or on one occasion in the course of the same transaction or episode, may be probative of the existence of a single scheme. But it does not follow that the existence of the same criminal impulse or the same transaction are indispensable prerequisites to the proof of a single scheme.

■ Other evidentiary facts may convincingly establish a single scheme. The initial formulation of the same subsisting fundamental object and purpose; the utilization of precisely the same methods and procedures in each of a series of successive situations to accomplish the original objective; the continuously interacting relationship and activities of the same persons who originated and launched the project; the victimizing of the same person through all of the acts—such evidentiary facts may, in the aggregate, demonstrate the existence of a single criminal enterprise, project and undertaking. Such is the case at bar.

■ The Supreme Court has plainly indicated that a deportation statute should be so interpreted as to resolve any doubts in favor of the alien. In Fong Haw Tan v. Phelan, 1948, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433, Mr. Justice Douglas, for a unanimous Court, said:

"We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile. Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

In the view of the foregoing, the respondent's motion for summary judgment is denied.

The petition to annul the order of deportation is granted.

Settle order on notice.

tempting to evade payment of the 1946 tax was "not a continuing one" (147 F.Supp. at page 774); (3) proof that the alien had "some subjective predilection amounting to a general scheme of criminality" or "a mere lurking propensi-

ty to commit certain kinds of offenses" or a "hidden desire to defraud the government of its taxes" did not constitute evidence of a "single scheme" (147 F.Supp. at page 774).