**Philip BARRESE, Plaintiff,**

v.

**John P. RYAN, District Director, Immigration and Naturalization Service, Hartford, Connecticut, Defendant.**

**Civ. No. 8497.**

United States District Court
D. Connecticut.

March 30, 1962.

Stewart J. Stowell, East Hartford, Conn., for plaintiff.

Harry W. Hultgren, Jr., U. S. Atty., Hartford, Conn., for defendant.

TIMBERS, District Judge.

This case is here for decision on the merits of plaintiff's action to enjoin defendant from deporting him to Italy.[1]

1. Jurisdiction is involved pursuant to 28 U.S.C.A. § 2201 and 5 U.S.C.A. § 1009.

The suit is essentially one seeking a "permanent injunction restraining the defendant from removing the plaintiff from the jurisdiction of this Court or from deporting said plaintiff". Plaintiff also seeks a judgment "setting aside the Or-

der of Deportation against the plaintiff"; a "de novo hearing"; a temporary injunction; and a declaratory judgment.

Defendant claims, inter alia, that "plaintiff has not set forth a cause of action for which relief can be granted"; that "summary judgment should be grant-

When the case was here earlier the Court sustained plaintiff's claim that he had been deprived of the privilege of being represented before the Board of Immigration Appeals by counsel of his choosing. 189 F.Supp. 449. Accordingly, without reaching the merits, the Court remanded the case to the Board with directions to accord plaintiff the privilege of being represented by counsel of his choosing throughout proceedings before the Board on appeal from the order of a special inquiry officer that he be deported. Id. at 452. Pending the hearing and determination by the Board of plaintiff's appeal, the Court enjoined defendant from deporting plaintiff. Id. at 453. Such injunction, by agreement of counsel, has remained in effect to enable the Court to decide the case on the merits, following the Board's rehearing and redetermination that plaintiff should be deported.

Plaintiff, age 63, entered the United States in 1916. He was born in Italy and is a national of that country. He has resided in the United States for the past 46 years—continuously, so he claims, except for a period of three years (1952–1955), during which, from time to time, he visited relatives in Canada. Defendant challenges the continuity of his residence in this Country only with respect to the 1952–1955 period.

The two grounds [2] upon which plaintiff has been ordered deported [3] are:

(1) That after entry into the United States he was convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct; [4] and

(2) That he was not in possession of a visa at the time of his last entry into the United States.[5]

The Court holds on the record before it that plaintiff is not deportable on either ground.

I

GOVERNMENT'S CLAIM THAT PLAINTIFF WAS CONVICTED OF TWO CRIMES INVOLVING MORAL TURPITUDE NOT ARISING OUT OF A SINGLE SCHEME OF CRIMINAL MISCONDUCT

■■ The two crimes upon which defendant relies to sustain this ground of deportation is that plaintiff failed in two successive years (1951 and 1952) to pay a $25 federal occupational tax required for the sale of liquor in connection with his operation of a restaurant in Bridgeport.

Specifically, October 8, 1958 plaintiff pleaded guilty in this Court [6] to two counts of an indictment charging him, in violation of Section 3253 of the Internal Revenue Code of 1939,[7] with having

ed for the Defendant on the merits"; and that the "temporary injunction enjoining the Defendant from deporting the Plaintiff in pursuance of law, should be dissolved".

Whatever may be the procedural niceties emerging from this morass of pleadings, the Court understands that what is sought is judicial review of the deportation order. Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955).

2. A third ground upon which the special inquiry officer ordered plaintiff deported was that he willfully failed to furnish periodic address reports to the United States Government. 8 U.S.C.A. § 1251 (a) (5). The Board originally sustained this ground of deportation. Upon

remand from this Court to permit plaintiff to be represented by counsel, the Board reversed the special inquiry officer on this ground of deportation and held, "We believe that the respondent has established that his failure was not a wilful one."

3. Pursuant to Section 241(a) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1251(a).

4. 8 U.S.C.A. § 1251(a) (4).

5. 8 U.S.C.A. § 1251(a) (1).

6. United States v. Barrese, Criminal No. 8643 (D.Conn., October 8, 1958).

7. 26 U.S.C.A. § 3253, 53 Stat. 391 (now Int.Rev.Code of 1954, § 5691(a), 26 U. S.C.A. § 5691(a) ).

carried on the business of a retail liquor dealer in Bridgeport on or about October 14, 1951 and April 6, 1952 without having paid the occupational tax on that business as required by law, with intent to defraud the United States of such tax.[8]

Upon his plea of guilty to the first and second counts, the Court imposed a sentence of 18 months imprisonment and a $500 fine on each count, the prison sentences to run consecutively. The Court later reduced the prison sentences to 15 months on each count.[9]

The crimes to which plaintiff pleaded guilty, an element of which was intent to defraud the United States, did involve moral turpitude. Jordan v. DeGeorge, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951).

The sole question presented by this challenged ground of deportation, therefore, is whether plaintiff's conviction of having carried on the business of a retail liquor dealer on or about October 14, 1951 and April 6, 1952 without having paid the occupational tax on such business, arose "out of a single scheme of criminal misconduct". The Court holds this question must be answered in the affirmative.

Plaintiff was in the restaurant business. He continued in that business without interruption during the period of the two offenses here involved. As an incident to that business he sold liquor. His sale of liquor was an inducement to attract customers to his restaurant. He tried carrying on his restaurant business with and without the inducement of liquor. With it, he succeeded; without it, business fell off. But the restaurant business, with or without liquor, continued. So did his failure to pay the tax.

In short, his carrying on the restaurant business; his sale, off and on, of liquor as an inducement to that business; and his failure to pay the tax required of one who sells liquor—were all inseparable elements, from plaintiff's standpoint, of one continuous business operation.[10] The element of failure to pay the tax, illegal to be sure, was nonetheless a part of the continuous business operation, according to plaintiff's scheme of doing business. His conviction of having carried on the business of a retail liquor dealer, under such circumstances, without having paid the $25 per annum federal occupational tax in two successive years of continuous operation of the same business, was a conviction "arising out of a single scheme of criminal misconduct". Zito v. Moutal, 174 F.Supp. 531 (N.D.Ill. 1959); Jeronimo v. Murff, 157 F.Supp. 808 (S.D.N.Y.1957).

In Zito, the two crimes which the court held arose out of a single scheme of criminal misconduct were the removal, deposit and concealment of non-tax-paid alcohol, with intent to defraud the United States of the tax imposed, in violation of Section 3321 of the Internal Revenue Code of 1939.[11] The two counts upon which the deportation order was based were identical except as to the dates of the offenses (September 9, 1940 and September 18, 1940) and the amounts of alcohol involved (50 gallons and 200 gallons). Judge Hoffman, in reversing the Board of Immigration Appeals,[12] followed the Jeronimo case,[13] noting (i) that the special inquiry officer in Zito "declined to follow Jeronimo because it was decided by a District Court in New York

8. A third count, identical with the first and second counts except it charged an offense on or about April 11, 1952, was dismissed by the Court.

9. Supra note 6, December 1, 1958.

10. It is noteworthy that the crime with which plaintiff was charged was that he did "*carry on the business* of a retail liquor dealer" without having paid the annual occupational tax (emphasis added);

the element of continuity is implicit in the statutory language.

11. 26 U.S.C.A. § 3321, 53 Stat. 401 (now Int.Rev.Code of 1954, § 7206(4), 26 U.S.C.A. § 7206(4) ).

12. The Board's opinion is reported, Matter of Z——, 8 I. & N. Dec. 170 (1958).

13. Jeronimo v. Murff, 157 F.Supp. 808 (S.D.N.Y.1957).

and was not binding in this district" [14] and (ii) that the Board "squarely faced the problem and concluded that the Jeronimo case incorrectly interpreted the law." [15]

In Jeronimo, the four crimes which the court held arose out of a single scheme of criminal misconduct were offenses of first degree grand larceny involving false and fraudulent claims for payments for labor and materials supplied to the City of New York under contracts for painting the interior surfaces of various municipal hospitals. The four counts upon which the deportation order was based were identical except for the periods of time of the offenses (all between April 28, 1947 and January 7, 1949), the amounts of money involved, the contract numbers, and the hospitals to be painted. Judge Herlands, in reversing the Board of Immigration Appeals,[16] rejected the government's contention that existence of the same criminal impulse or the same transaction are indispensable prerequisites to the proof of a single scheme.[17] He summarized, on the other hand, the type of evidentiary facts which may convincingly establish a single scheme: [18]

"The initial formulation of the same subsisting fundamental object and purpose; the utilization of precisely the same methods and procedures in each of a series of successive situations to accomplish the original objective; the continuously interacting relationship and activities of the same persons who originated and launched the project; the victimizing of the same person through all of the acts—such evidentiary facts may, in the aggregate, demonstrate the existence of a single criminal enterprise, project and undertaking."

The government seeks to distinguish Zito and Jeronimo on the ground that plaintiff in each case had been convicted on a conspiracy count (although conviction on the conspiracy count was not relied on as a ground of deportation) in addition to the substantive counts which were relied on. It is true that the conspiracy counts in Zito and Jeronimo constituted persuasive evidence that all of the acts and transactions alleged in those indictments were connected together and that all such acts and transactions constituted parts of a common scheme and plan. The absence of a conspiracy count, as in the instant case, is not decisive, however, of whether the substantive crimes arose out of a single scheme of criminal misconduct. To hold otherwise would be to read into Section 1251(a) (4) a requirement that a single scheme of criminal misconduct cannot be found except in the context of a conspiracy. Congress obviously intended no such thing. The absence of a conspiracy count indicates only that plaintiff committed the crimes alone and not in combination with anyone else.[19]

The government places heavy reliance, in its attempt to negate a single scheme of criminal misconduct in the instant case, upon plaintiff's testimony before the special inquiry officer [20] that sometime between October 14, 1951 and April 6, 1952 (the dates of the two offenses to which he pleaded guilty), he stopped selling liquor in his restaurant, but thereafter resumed the sale of liquor when he saw his restaurant business was falling off. The existence of a single scheme of criminal misconduct does not

14. Zito v. Moutal, 174 F.Supp. 531, 535 (N.D.Ill.1959).

15. Id. at 535–536.

16. The Board's opinion is not reported.

17. Supra note 13, at 813–815.

18. Id. at 815.

19. The Board in Zito, supra note 12, at 174, recognized that even absent the conspiracy count in Jeronimo "it is possible to argue very convincingly that the Court would have been able to reach the same result it did."

20. At this stage of the hearing before the special inquiry officer plaintiff was not represented by counsel. 189 F.Supp. 449, 451. See Transcript of Hearing before special inquiry officer, August 18, 1959, pp. 27–28, 29–31.

turn on the subjective declarations of an alien as to whether single or separate transactions were involved or whether he was motivated by single or multiple criminal impulses. Plaintiff has at best a limited comprehension of the English language, as demonstrated by his testimony before the special inquiry officer [21] as well as before this Court. He was not represented by counsel at the time of his testimony before the special inquiry officer relied on by the government. To permit deportation of a man who has been a resident of the United States for nearly half a century to turn upon such testimony, under the circumstances disclosed by this record, would be little short of ludicrous.[22]

The cases relied on by the government are readily distinguishable:[23]

(1) In Fitzgerald ex rel. Miceli v. Landon, 238 F.2d 864 (1 Cir. 1956), aside from the "very meager" record in a habeas corpus proceeding, the alien had been convicted (i) under one statute, of indecent assault and battery on a young child and (ii) under another statute, of being a lewd, wanton or lascivious person in speech or behavior over a three month period. In affirming dismissal of the petition for a writ of habeas corpus, the court pointed out that proof of a "single scheme" requires something more than evidence of the use of "the same technique and pattern of conduct" (Id. at 867); it requires proof of "a single criminal enterprise" (Id. at 865).

(2) In Chanan Din Khan v. Barber, 253 F.2d 547 (9 Cir. 1958), cert. denied, 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 1364 (1958), the alien had been convicted, in one prosecution, of wilfully attempting to evade payment of federal income taxes in two separate years (1946 and 1947). In affirming the district court's conclusion that the two crimes did not arise out of a single scheme of criminal misconduct, the court noted that "Fraudulent returns in two different years could, or could not, be one plan or scheme. *But we have no facts to prove such a scheme.*" (Emphasis added) (Id. at 549).

(3) In Wood v. Hoy, 266 F.2d 825 (9 Cir. 1959), the alien had been convicted in July 1957 of two counts of first degree robbery (robbing a liquor store on July 13, 1956 and robbing a drive-in theater on July 16, 1956—in each instance, with three accomplices); he testified before the special inquiry officer that one of his accomplices had planned both robberies, before the first was committed; the court held the government had not established that both crimes did not arise out of a single scheme and remanded the case for further proceedings.

---

21. The record shows that even the special inquiry officer had difficulty understanding questions put to plaintiff by counsel for the immigration service (Transcript, August 18, 1959, p. 31):

"BY SPECIAL INQUIRY OFFICER: I don't understand that question. You don't have to answer that, Mr. Barrese."

Typical of plaintiff's confusion at this hearing was his attempt to explain his understanding of the offense for which he was being deported (Transcript, August 18, 1959, p. 30):

"SPECIAL INQUIRY OFFICER TO RESPONDENT: Q. When you talk about paying a fine are you talking about the conviction for which you are now serving a sentence?

"A. Yes. This is mixed up. I don't understand. They pinched me. Pay fine. I thought I pay penalty. Then eight years later they had me with this."

22. In Jeronimo, petitioner (likewise, not represented by counsel) had testified before the special inquiry officer in response to a question incorporating the statutory language, "Yes, it is only one scheme." Supra note 13, at 811. Judge Herlands, in reaching his decision, placed no reliance on such testimony.

23. In Jeronimo, Judge Herlands found the Miceli and Khan cases to be "clearly and sharply distinguishable from the case at bar." Supra note 13, at 814–815. In Zito, Judge Hoffman said, "It should be noted that 'the cases' referred to by the Board are either Board decisions or *obiter dictum* from cases which are distinguishable on their facts from the case at bar [citing the Miceli and Khan cases]." Supra note 14, at 536.

(4) In Cestaro v. Ryan, Civil No. 6409, D.Conn. June 27, 1957 (decided prior to the Jeronimo and Zito cases), Judge Smith did hold that conviction on five counts of forging and uttering prescriptions in violation of 18 U.S.C. § 72 did not arise out of a single scheme; the point of the decision, however, was to overrule plaintiff's claim that the crimes arose out of a single scheme "just because the crimes were identical and the conviction and sentencing took place at the same proceeding." [24]

█ The crux of the government's position in the instant case, in urging that the two crimes of which plaintiff was convicted "arose out of a single scheme of criminal misconduct", is simply this: it refuses to accept the judicial construction of that language by the courts in the Jeronimo and Zito cases.

Jeronimo was decided adversely to the government by Judge Herlands in December 1957; [25] the government did not appeal. In October 1958 the Board, in its opinion in Zito, refused to follow Jeronimo; it noted that the special inquiry officer had "dismissed Jeronimo from consideration on the ground that it was decided by a district court in a circuit other than that which would have jurisdiction of the respondent's case"; [26] and the Board based its decision in Zito "primarily on the belief that Jeronimo does not set forth the proper rule" [27] and that "Jeronimo does not state a correct rule of law."[28] In March 1959 Judge Hoffman reversed the Board in Zito, concluding "that the Board has erroneously interpreted the statute in question, and

that the proper interpretation is set forth in the Jeronimo case"; [29] the government did not appeal.

In the instant case, the Board's initial opinion of May 23, 1960 ignored Judge Herland's decision in Jeronimo (which had been decided two and one half years earlier); ignored Judge Hoffman's decision in Zito (which had been decided more than a year earlier); and relied on its own decision in Zito (which had been reversed) and its own decision in another case clearly distinguishable from the instant case.[30] The Board's second opinion of February 15, 1961 in the instant case, rendered after this Court remanded the case to the Board to permit plaintiff to be represented by counsel, continued to ignore Jeronimo; it did note that its decision in Zito "was overruled in Zito v. Moutal, 174 F.Supp. 531 (N.D., Ill.)", but added that "we see no reason to change our conclusion."

It would seem to this Court that for the Board to ignore or adamantly to refuse to follow such carefully reasoned decisions as those by Judge Herlands in Jeronimo and by Judge Hoffman in Zito (from neither of which the government appealed) is to undermine orderly administrative procedure in the enforcement of the immigration laws.

What the Board has attempted for a number of years, without judicial sanction, is to read into the statute language that is not there: it insists that "single scheme" must be equated with "one criminal episode", that there can be no single scheme "unless one act was involved, or those which were done were so related in time and purpose as in reality to consti-

24. As Judge Smith points out, it was the intention of Congress in enacting Section 241(a) (4) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1251 (a) (4), to eliminate the necessity of two distinct prison terms and two separate sentencings as required under Section 19(a) of the Immigration Act of 1917, 8 U.S.C.A. § 155(a), 39 Stat. 874. H.R. Rep. No. 1365, 82d Cong., 2d Sess. pp. 59-61 (1952); 1952 U.S.Code Cong. & Adm.News, p. 1715. See Fong Haw Tan

v. Phelan, 333 U.S. 6, 68 S.Ct. 374, 92 L.Ed. 433 (1948).

25. Supra note 13.

26. Supra note 12, at 171.

27. Id. at 172.

28. Id. at 176.

29. Supra note 14, at 537.

30. Matter of B——, 8 I. & N. Dec. 236 (1958).

tute but one separate episode." [31] No court has adopted this construction. At least two courts have categorically rejected it.[32] This Court likewise rejects it.

■ Moreover, when the Board declares that "The statute should be interpreted to include the greatest number of twice-convicted aliens",[33] it ignores the settled canon of statutory construction that a deportation statute should be so interpreted as to resolve any doubts in favor of the alien. Mr. Justice Douglas, speaking for a unanimous Court in Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948), put it this way:

"We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, [92 L.Ed. 17]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

Accordingly, this Court concludes that plaintiff's conviction of having carried on the business of a retail liquor dealer on or about October 14, 1951 and April 6, 1952 without having paid the occupational tax on such business, arose "out of a single scheme of criminal misconduct." The deportation order cannot be sustained on this ground.

## II

GOVERNMENT'S CLAIM THAT PLAINTIFF WAS NOT IN POSSESSION OF A VISA AT THE TIME OF HIS LAST ENTRY INTO THE UNITED STATES

■ Plaintiff last entered the United States at Blaine, Washington, October 6, 1955. Although not in possession of a visa, he did have a border crossing card valid until March 1, 1956.[34]

As the Board correctly noted, "A 'returning resident' is entitled to enter the United States without a visa under certain circumstances" in accordance with the statute [35] and the regulations in effect

---

31. Matter of Z———, supra note 12, at 175–176; Matter of B———, supra note 30, at 238–239.

32. Judge Herlands in Jeronimo said, "The fallacy in the Government's major premise is that it erroneously prescribes 'a single sustained criminal impulse' as the condition precedent to the existence of a single scheme of criminal misconduct. There is risk of reducing the discussion to a quodlibet by attempting to equate a 'single scheme of criminal misconduct' with one all-important subjective fact." Supra note 13, at 814.

Judge Hoffman in Zito, rejecting the Board's interpretation of the statute, observed, "To construe the limitation as applying only to a single criminal 'episode' is not only to resolve all doubts against the alien but also to read into the limitation a word which it does not contain." Supra note 14, at 537.

33. Matter of Z———, supra note 12, at 175.

34. Marked Plaintiff's Exhibit A at the hearing in this Court October 17, 1960.

The Board, in its opinion of February 15, 1961 after remand from this Court, noted plaintiff's testimony before the special inquiry officer that he had this border crossing card in his possession at the time of his last entry. The Board does not appear to have had this card before it, although it was released by order of this Court November 10, 1960 for purposes of the rehearing before the Board.

35. 8 U.S.C.A. § 1181(b):

"Notwithstanding the provisions of section 1182(a) (20) of this title, in such cases or in such classes of cases and under such conditions as may be by regulations prescribed, otherwise admissible aliens lawfully admitted for permanent residence who depart from the United States temporarily may be readmitted to the United States by the Attorney General in his discretion without being required to obtain a passport, immigrant

at the time of the last entry.[36]

Plaintiff in the instant case, if "returning to the United States after a temporary absence of not more than six months in Canada", falls squarely within 8 C.F.R. § 211.2(c) (1) (1952):

"§ 211.2 *Immigrants not required to present visas or passports.* Immigrants of the following-described classes applying for admission to the United States need not present visas or passports:

\* \* \* \* \* \*

"(c) Aliens (including alien crewmen) of the following-described classes who have been lawfully admitted for permanent residence, who are otherwise admissible, and who are returning after a temporary absence:

"(1) An alien who is returning to the United States after a temporary absence of not more than six months in Canada or Mexico only, and who presents a valid unexpired resident alien's border crossing identification card."

The Board, applying the criteria specified in United States ex rel. Alther v. McCandless, 46 F.2d 288 (3 Cir. 1931), held that plaintiff would have been entitled to reenter the United States as a "returning resident" on October 6, 1955 if

(1) he had been originally lawfully admitted for permanent residence;

(2) he had that status when he departed;

(3) he departed from the United States with the intention of returning;

(4) he had not abandoned this intention; and

(5) he returned from a temporary visit abroad.

The Board assumed that plaintiff complied with items (1), (2), (3) and (4); it limited the issue to item (5), "whether [he] was returning from a temporary visit abroad."

On this issue plaintiff's testimony before the special inquiry officer was unequivocal that between 1952 and 1955 he visited his sisters in Canada from time to time; that he never stayed in Canada longer than 30 days at a time; that following each such visit he returned to the United States; and that when he reentered the United States October 6, 1955 he intended to resume his permanent residence here. There was not a scintilla of testimony before the special inquiry officer that plaintiff intended his visit to Canada to be anything but temporary.

The Court of Appeals for this circuit, in United States ex rel. Lesto v. Day, 21 F.2d 307 (2 Cir. 1927), has indicated what it regards as a temporary visit:

"Without attempting a complete definition of 'a temporary visit,' we may say that we think the intention of the departing immigrant must be to return within a period relatively short, fixed by some early event".

And the intention of the immigrant-visitor, when it can be determined, will control. United States ex rel. Polymeris v. Trudell, 49 F.2d 730, 732 (2 Cir. 1931); cf. United States ex rel. Alther v. McCandless, supra.

The basis of the Board's finding that plaintiff was not returning from a temporary visit to Canada when he reentered the United States October 6, 1955 was that his testimony before the special inquiry officer August 18, 1959 conflicted with his testimony at a Canadian deportation hearing April 7, 1955. The conflicting testimony concerned primarily

---

visa, reentry permit or other documentation."

A "border crossing identification card", under 8 U.S.C.A. § 1182(a) (20), is one of the documents acceptable in lieu of a valid unexpired immigrant visa for admission of an alien into the United States; and such document may be re-

quired of an alien by regulations of the Attorney General issued under 8 U.S. C.A. § 1181(e).

36. Immigration and Nationality Regulations, 8 C.F.R. § 211.2(c) (1) (1952), 17 Fed.Reg. 11483 (1952); 8 C.F.R. § 211.2(c) (6) (1955), 20 Fed.Reg. 2022 (1955).

the nature of work done by plaintiff in Canada and the extent of his business interests there. Even in the Canadian hearing plaintiff testified that his visits to Canada to see his sister were for a week or two at a time and never more than a month; that he left clothes in the United States; and at no time during the Canadian hearing did he deny an intention to return to permanent residence in the United States.

Giving due weight to the special inquiry officer's opportunity to observe plaintiff's demeanor as a witness and to evaluate his credibility in the light of inconsistencies between his testimony in the United States and Canadian hearings, a careful examination of the entire record leads this Court to the inescapable conclusion that the Board's decision, which dismissed plaintiff's appeal from the decision of the special inquiry officer, is not based upon reasonable, substantial and probative evidence within the meaning of Section 242(b) (4) of the Immigration and Nationality Act.[37] As Judge

Hoffman stated in Zito, "I have found no case which attempts to define 'reasonable, substantial, and probative evidence.' However, those words are certainly as broad in scope as the words 'substantial evidence.' "[38] The government has failed to sustain its burden of proof with respect to this ground of deportation. Werrmann v. Perkins, 79 F.2d 467, 469 (7 Cir. 1935); Tutrone v. Shaughnessy, 160 F.Supp. 433, 438 (S.D.N.Y.1958); United States ex rel. Belfrage v. Shaughnessy, 113 F.Supp. 56, 60 (S.D.N.Y. 1953), aff'd, 212 F.2d 128(2 Cir. 1954).

Accordingly, this Court concludes that at the time of plaintiff's last entry into the United States October 6, 1955, although not in possession of a visa, he did have a border crossing card which entitled him as a returning resident legally to reenter the United States from a temporary visit to Canada. The deportation order, not based on reasonable, substantial and probative evidence to the contrary, cannot be sustained on this ground.[39]

---

37. 8 U.S.C.A. § 1252(b) (4).

38. Supra note 14, at 537–538, and cases there cited.

39. The Court having concluded that plaintiff is not deportable on either of the two grounds urged by the Government, it becomes unnecessary to rule upon certain questions presented by the record of proceedings before the special inquiry officer and the Board as to whether those proceedings departed from essential standards of fairness. For example:

(i) Injection into the record by the immigration service of what it describes as plaintiff's "very considerable and extensive criminal record"; this is illustrated by Exhibit 11 (an unconfirmed list of arrests and convictions which the Board said "We have made no use of") and by the following statement by an immigration service representative in a written memorandum to the Board in lieu of oral argument:

"In the absence of the alien and counsel, I am not going to address myself to the merits of the case at all. I think you will note however, in your consideration of the case, he *does* have a very considerable and extensive criminal record, which you may want to keep in

mind in whatever action you take on the appeal."

(ii) Failure to accord plaintiff the right to confront headless witnesses against him whose statements to immigration service representatives were included in the record, although the Board disclaimed reliance thereon in finding plaintiff deportable.

(iii) Failure to furnish plaintiff and his counsel with the complete record, including exhibits, upon which the finding of deportability was based, except to notify them that they "could review the record at [the Board's] offices in Washington, D. C."

(iv) Failure, in view of plaintiff's limited comprehension of the English language, to furnish him with an interpreter and other assistance in proceedings before the special inquiry officer and in drafting his appeal papers from the Federal Correctional Institution at Danbury, Connecticut. 189 F.Supp. 449, 451–452.

(v) Failure of the Board, in view of this Court's remand of the case to the Board "with directions to accord to plaintiff the privilege of being represented by counsel of his choosing *throughout proceedings on appeal before that Board*"

## CONCLUSIONS

(1) This Court has jurisdiction over the parties and the subject matter.

(2) The two crimes of which plaintiff was convicted after entry into the United States, although involving moral turpitude, arose out of a single scheme of criminal misconduct.

(3) At the time of plaintiff's last entry into the United States, although he was not in possession of a visa, he did have a border crossing card which entitled him as a returning resident legally to reenter the United States from a temporary visit to Canada.

(4) Defendant has failed to sustain his burden of proving that the deportation order of February 3, 1960 was based on reasonable, substantial and probative evidence.

(5) The said deportation order, being invalid, should be vacated and set aside.

(6) Plaintiff is entitled to a permanent injunction enjoining defendant from deporting or removing plaintiff from the United States.

 As noted earlier, although deportation technically is not a criminal punishment (Mahler v. Eby, 264 U.S. 32, 39, 44 S.Ct. 283, 68 L.Ed. 549 (1924)), it may visit as great a hardship as the deprivation of the right to pursue a vocation or a calling. Bridges v. Wixon, 326 U.S. 135, 147, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). In the words of Mr. Justice Brandeis, deportation may result in the loss "of all that makes life worth living". Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938

(1922). Thus, "Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." Bridges v. Wixon, supra, 326 U.S. at 154, 65 S.Ct. at 1452.

 This Court holds on the record before it that defendant is not entitled to deport plaintiff who has been a resident of the United States for the better part of half a century. The Court recognizes the earnestness and zeal with which the immigration service has handled this deportation proceeding, as well as the depth of its conviction that plaintiff is a person who should be deported. But after all ours is a government of laws, not of men. Judicial review of a deportation order is a necessary sequel to a sound, vital administrative process. That is not to say that a federal court, particularly a district court, in reviewing a deportation order is infallible. If wrong, it should be reversed and promptly. The federal courts of appeals are not notably reluctant to correct errors committed by the district courts. Appellate review of a district court decision believed by the immigration service to be erroneous, rather than adhering at the administrative level to a statutory construction repeatedly rejected by the courts, will enhance rather than undermine confidence in the administrative process. This is particularly so in the administration of laws so vital to the security and well being of our people as the immigration laws. And the immigration service need yield to no agency of the government in its sturdy tradition earned through the years of unbending dedication to the deepest aspirations of our people.[40]

(emphasis added), 189 F.Supp. 449, 452, to do anything more than receive a brief from plaintiff's counsel and rewrite its opinion; no opportunity was afforded, as contemplated by this Court's remand, to reopen proceedings on appeal before the Board *from the very inception of the appeal,* including the all-important drafting of the notice of appeal and other papers to delineate the issues on appeal (all of which were prepared initially by

plaintiff without counsel from a federal penitentiary, 189 F.Supp. 449, 451–452).

40. The District Court hearing in this case having been concluded prior to the effective date of Section 5(b) of Public Law 87–301, 75 Stat. 651, 8 U.S.C.A. § 1105a note (1962), the case was not required to be transferred to the Court of Appeals in accordance with the provisions of that Statute. Dentico v. Immigration and Naturalization Service, 303 F.2d 137 (2 cir. 1962).