## MATTER OF GUTNICK*

### In Deportation Proceedings

### A-13438882

*Decided by Board October 30, 1969*

Where respondent, having a general plan to burglarize cars in different cities over a two-week period, was apprehended in the act in his first attempt in Phoenix, Arizona on February 29, 1969, was jailed overnight, given a hearing and released on bond the following day, and six days later on March 6, 1969 in a different city (Tucson) he burglarized another car belonging to a different individual, his convictions for the two crimes are not convictions arising out of a single scheme of criminal misconduct within the meaning of section 241(a)(4) of the Immigration and Nationality Act.

CHARGE:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of two crimes involving moral turpitude: burglary from vehicle and burglary, first degree.

ON BEHALF OF RESPONDENT:
Ruben Montemayor, Esquire
1414 Tower Life Building
San Antonio, Texas 78205

ON BEHALF OF SERVICE:
R. A. Vielhaber
Appellate Trial Attorney
Bernabe Q. Maldonado
Trial Attorney
(Brief filed)

Respondent appeals from the order of the special inquiry officer requiring his deportation on the charge stated in the caption. The appeal will be dismissed.

Respondent, a 38-year-old single male, a native and citizen of Canada, was admitted to the United States for permanent residence in 1963. From 1964 to 1968 he made short business and pleasure trips to Canada. He last returned from such a trip in September 1968.

Respondent's deportation is sought because he was twice convicted of crime. The issue is whether the crimes arose out of a

---

The alien in this case is also the subject of Interim Decision No. 2075.

single scheme of criminal misconduct. Respondent's testimony concerning the convictions follows: On February 29, 1969, after he and his friends, Levy and Knight, decided to burglarize autos in Phoenix, Casa Grande, Tucson and Nogales over a two week period using master keys for entering certain models of Fords and Cadillacs (pp. 22, 32, 34, 63, 70–72, 79, 80), they broke into a Cadillac in Phoenix. The police apprehended them in the act, and jailed them overnight. The next afternoon, they were given a hearing and released on bond (p. 20). They left Phoenix that evening to escape police surveillance. After the first arrest, Levy would not go on with the plan (pp. 36, 48), but respondent and Knight continued with it (pp. 66–67, 73). The following day they went to Casa Grande. Unsuccessful after a two day search, in finding the kind of cars they were interested in (pp. 24–25, 36–37, 48–49), they went on to Tucson, the next city on their list. They arrived there about the third or fourth of March. They visited with a friend. On March 6, they burglarized another Cadillac. Shortly thereafter, they were caught by the police (pp. 38, 24–25, 68). The two cars entered did not belong to the same individual. Tucson is about 120 miles from Phoenix.

On November 6, 1968, respondent was tried in Phoenix for the first offense. He entered a plea of guilty to burglary from a vehicle. The imposition of sentence was suspended and he was placed on probation for 13 months (Ex. 3). On November 19, 1968, he was tried in Tucson for the second offense. He entered a plea of guilty to burglary in the first degree. Imposition of sentence was suspended and he was placed on probation for three years (Ex. 4). The court in sentencing respondent stated that "to some extent [respondent was] on a spree and these were two separate acts (Ex. 5, p. 6)." The court also stated that one of his reasons for putting the respondent on probation was that the judge who presided in the first case put him on probation "for a part of this same series" (Ex. 5, p. 11).

The first question is whether there was a general plan to burglarize cars. The trial attorney questions the existence of such a plan. The special inquiry officer, finding respondent's testimony self-serving and contradictory, apparently concluded a general plan did not exist. We find that while there was no plan to burglarize a car owned by any particular person, respondent and his friends did plan to enter certain models of Cadillacs and Fords for which they had master keys, during respondent's two weeks vacation. The inconsistencies relied upon by the special inquiry officer are not of a substantial nature nor were they brought to

the respondent's attention for comment. Moreover, respondent consistently testified that there was a plan.

A question exists as to whether the original plan was aborted and supplanted by a new one after respondent had been arrested and released on bond. Was the second crime the result of a new plan or a continuation of the first? The respondent testified that after the first arrest Levy withdrew, but that he and Knight continued with their original plan without any discussion (pp. 67–73). He answered in the affirmative a question by the Trial Attorney as to whether, after he had been caught the first time, he believed that it would be the last time he would be in trouble. He agreed with the statement by the Trial Attorney that after the arrest he decided to start anew and to live a clean life (p. 22). This would indicate that he mentally withdrew from the plan and only later again associated himself with it. When this was called to his attention, he explained that he gave no thought to repentance or to the plan while he was in jail because he was occupied only with thoughts of getting out of jail. He also said that he did think it would be the last time he would be in trouble. His further attempt to explain was barred by the special inquiry officer (pp. 77–78). Under these circumstances we do not believe it is proper to draw an adverse inference from this apparent conflict.

We have concluded that respondent had a general plan to burglarize cars in different cities over a two week period. This does not mean that we must find that his crimes arose out of a single scheme. The problem of determining the existence of a single scheme is discussed in *Nason v. INS.*, 394 F.2d 223 (2 Cir., 1968), cert. denied 393 U.S. 830 (1968). The court dismissed the petition of Nason who sought to upset a deportation order based on his conviction of crimes involving two periods of mail fraud activity separated by an interval of over nine months. The court stated:

petitioner's nebulous intention to repeat his crime with the same or other victims some day in the indefinite future, will not bridge the gap of nine months. The word "scheme" implies a specific, more or less articulated and coherent plan or program of future action, much more than a vague, indeterminate expectation to repeat a prior criminal *modus operandi*. As used in the statute, "scheme" is not to be construed as an abstract concept or strategy capable of future application at any time and any place, but planned definitely for none. It is here, especially, that Nason's stress on the similarity between the two crimes misses the mark. It should be noted that the statute does not speak in terms of a "common scheme or plan." The impropriety of such a test is readily apparent for it could be invoked to save an man who repeated a successful crime already tried and had the good fortune to employ not only the same methods, but also to have chosen the same

414

or a similar victim. Congress meant to give the alien a second chance, not to spare the recidivist. See *Costello, supra,* 311 F.2d at 348. Under the circumstances of this case, petitioner cannot with grace urge that he was not given that second chance. (at p. 227).

The problem was also discussed in *Costello v. INS,* 311 F.2d 343 (2 Cir., 1962), reversed on other grounds, 376 U.S. 120 (1964). Costello was unsuccessful in contending that two convictions for violation of income tax laws in successive years arose out of a single scheme. The court pointed out that there was no connection between the two crimes. The court said:

The statute makes no reference whatever to any "common scheme or plan"; nor would it seem reasonable to suppose that the Congress intended to grant immunity from deportation to those who over a period of time pursued a course of criminal misconduct, involving numerous successive, separate crimes, consummated at different times but in the same manner, or with the same associates, or even by the use of the same fraudulent devices, disguises, tools or weapons. Nor in the case of successive bank robberies at different times and places, for example, would it seem that these could be said to have arisen out of a single rather than two separate schemes of criminal misconduct, simply because the robbers, prior to the first robbery, had in mind and had discussed the robbery of the second bank after the hue and cry over the first robbery had subsided (*Dicta,* at p. 348).

Using the tests set forth in *Nason, supra,* and in *Costello, supra,* we find that respondent's crimes did not arise out of a single scheme. There was no concrete strategy planned for a certain time and place. Respondent's intent to rob cars was a nebulous one. He had no specific owner, no specific car, no specific time, and no specific limited area in mind. His was only a strategy capable of future application at a nonspecific time and place within a two-week period.

Nor do the crimes committed evidence the existence of a single scheme. They did not arise out of the same act or transaction. They were not part of a successive series of uninterrupted crimes. An arrest, detention, hearing and posting of bond intervened between the two crimes. Days passed between them. The second was the result of a random search in two different cities before it was committed. The crimes were not related or connected. The owners of the cars were not the same. The cars were not the same. The locale was not the same.

Moreover, as the quotation from *Nason, supra,* points out, the reason for the single scheme exception is to give an alien a second chance. Respondent had a second chance. His arrest, detention, hearing, and release on bond; his being followed by the police— all these should have told him he was free to withdraw from his plan and that he did not have to commit the second crime.

Cases cited by counsel are distinguishable. In *Nason, supra,* the court pointed out that *Jeronimo v. Murff,* 157 F. Supp. 808 (S.D. N.Y., 1957), involved a conspiracy charge. This factor is not present here. Furthermore, *Nason* points out that *Jeronimo* does not go beyond what is said in *Nason.* The test in *Nason* clearly reveals that the instant case does not involve a single scheme.

*Sawkow v. INS,* 314 F.2d 34 (3 Cir., 1963), indicates that there is a possibility that crimes committed within minutes of each other arose out of a single scheme. Here the time interval and other factors clearly establish there is no connection between the two crimes.

*Chanan Din Khan v. Barber,* 253 F.2d 547 (9 Cir., 1958), cert. denied 357 U.S. 920 (1958), supports our position. There similar crimes (tax frauds in successive years) were held not to arise out of a single scheme because the record did not establish that they were connected.

*Wood v. Hoy,* 266 F.2d 825 (9 Cir., 1959), involved two robberies committed within three days of each other. There was unrelated evidence that the specific crimes were planned in advance. We have pointed out that here there was only a general plan.

*Zito v. Moutal,* 174 F. Supp. 531 (D.C. Ill., 1959), involved sales of liquor with intent to defraud the United States. They were connected since they arose out of the operation of an illegal business.

Counsel contends that an error was committed in admitting the criminal records (Exs. 4, 5) showing that respondent had been convicted of the crimes, because the court records of the convictions were not authenticated under Rule 44, Federal Rules of Civil Procedure, which requires the record be made by its custodian and that it be accompanied by a certification to that effect. The records here are made by the deputy clerks of the courts involved. Each clerk certified that the record was a true copy of the original. Each copy bears the seal of the court. There is no certification that the clerk has custody. Counsel contends that the failure to have such a certification made the records inadmissible. The contention must be dismissed. As the trial attorney has pointed out, deportation proceedings are not controlled by Rule The question in the deportation proceeding is whether respondent has had due process; or to be specific here, whether the criminal records correctly reflect the facts. Counsel points to no error in the records. At the hearing, he stipulated the correctness of the facts incorporated in the criminal records concerning the convictions (pp. 2–3). He offered a transcript of proceedings re-

lating to the second crime (Ex. 5). The respondent admitted the facts concerning the convictions which are stated in the criminal records (pp. 8–12). We find no error committed in the receipt of this evidence. *Maroon v. INS*, 364 F.2d 982 (8 Cir., 1966). See *Matter of Argyros*, 11 I. & N. Dec. 585 (BIA, 1966) ; *Matter of Pang*, 11 I. & N. Dec. 489 (BIA, 1966).

We note the trial attorney's effective brief.

**ORDER:** The appeal is dismissed.