MATTER OF VOSGANIAN

In Deportation Proceedings

A-10160233

*Decided by Board December 21, 1966*

Since to show a single scheme of criminal misconduct within the meaning of section 241(a)(4), Immigration.and Nationality Act, requires, at least, the existence of a purpose so definite and limited in scope as to time, place, and manner as to make it reasonably probable that the alien would commit the very crimes for which he stands convicted, it has been established by clear, unequivocable, and convincing evidence that respondent's convictions on 2 separate occasions in 2 different courts of larceny (7 counts), from 2 different victims in the same locale, and of larceny by check (5 counts), involving a third victim in a different locale, committed over a period of approximately 1 month, did not arise out of a single scheme of criminal misconduct where respondent, by his own testimony, indicated that initially the purpose of his action, motivated by the needs of the moment, was to get money to gamble and win money to pay his debts but losses increased his debts, creditors, and pressures, broadened the scope of his activities, and he engaged in a frantic series of activities until apprehended.

CHARGE:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct.

ON BEHALF OF RESPONDENT:  
I. Miles Pollack, Esquire  
850 Broadway  
New York City 10013

ON BEHALF OF SERVICE:  
R. A. Vielhaber  
Appellate Trial Attorney

This is an. appeal from the decision of the special inquiry officer, finding respondent deportable as charged, holding him to be statutorily ineligible for voluntary departure, and ordering his deportation to England, the country of designation, with an alternative order of deportation to Lebanon.

The Government introduced, in support of the allegations in the order to show cause, a record of conviction of the respondent, in the Superior Court for Middlesex County, Massachusetts, dated February 11, 1964, showing that respondent had pleaded guilty to an indict-

ment charging seven counts of larceny from two different victims, the said acts taking place in Medford, Massachusetts, on November 12, 13, 20, 21 and 23, 1963. Respondent was sentenced to the House of Correction for one year, but sentence was suspended for a period of three years upon condition that respondent make restitution in the amount of $1,155 (Ex. 2).

The Government also introduced, as Exhibit 3, a second record of conviction showing that on March 28, 1964, on his plea of guilty, respondent was convicted in the District Court of Peabody, County of Essex, Massachusetts, of five counts of larceny by check, each check being in the amount of $50.00, the checks being made on December 11, 13, 14 and 15, 1963, all being cashed in the same department store in Peabody, Massachusetts (which was not one of the two victims involved in the first set of convictions). Respondent was sentenced to one year in the House of Correction, but sentence was suspended until January 3, 1965 on condition that restitution be made.

Respondent concedes that all of the factual allegations in the order to show cause are true, and concedes that the above records of conviction relate to him and that he was guilty of the crimes charged therein. He contests deportability, however, alleging that the crimes referred to all arose out of a single scheme of criminal misconduct.

Counsel seeks on appeal to raise the additional issue of whether the crimes involved moral turpitude, mentioning the statutes of several states covering the passing of worthless checks, and referring to a decision of the Board (*Matter of Stasinski*, Int. Dec. No. 1476, decided May 26, 1965) in which a conviction for issuing or passing a worthless check, under a specific section of Wisconsin law, was held not to be a crime involving moral turpitude. The respondent here was charged with, and convicted of, *larceny* and *larceny by check*. The courts have long since settled the question that larceny is a crime involving moral turpitude, cf. *Tillinghast* v. *Edmead*, 31 F.2d 82 (1st Cir., 1929); *Wilson* v. *Carr*, 41 F.2d 704 (9th Cir., 1930). The record of conviction is controlling, *Wing* v. *United States*, 46 F.2d 755 (7th Cir., 1931), and speculation as to what other charges might have been brought under the circumstances can in no way affect the question of deportability.

The Government has the burden of proving deportability by clear, unequivocal, and convincing evidence (cf. *Woodby* and *Sherman* cases, 35 L.W. 4053, decided by U.S. Supreme Court, December 12, 1966), and under the section of law involved here, it must show not only the conviction of two crimes involving moral turpitude but also that they did not arise out of a single scheme of criminal misconduct, *Wood* v. *Hoy*, 266 F.2d 825 (9th Cir., 1959). We consider that the Government,

by its introduction of the two records mentioned above, showing conviction of two differently defined crimes (seven counts of larceny, and five counts of larceny by check), in two different courts, involving three different victims, taking place in two different locations, in two separate months, with no connection between them other than that respondent was the defendant, established its *prima facie* case. It, therefore, was not error for the special inquiry officer, at that point, to suggest to respondent through counsel that if it was his contention that the crimes arose out of a single scheme of criminal misconduct, he should come forward with whatever evidence he wished to present on that issue.

Counsel then asked the Government to introduce, on respondent's behalf, thirteen other sets of court records (Exs. 5–17), which establish that respondent also pleaded guilty to 31 more counts of larceny, 4 more counts of larceny by check and 1 count of attempt to steal. As the special inquiry officer points out, most of these could have served as well for the purposes of section 241(a)(4) as the two sets of convictions specified in the order to show cause (except for the 14 counts making up Exhibit 5, where the cases were placed "on file" by the court, a disposition held not to have the force of a conviction for deportation purposes, *Pino* v. *Landon*, 349 U.S. 901 (1955)).

Respondent testified on his own behalf, explaining his situation thus:

In 1963, when he was residing and working in Massachusetts, he began to gamble at races on nearby tracks, placing his bets either in person at the tracks or with bookmakers off-track. He was apparently completely unsuccessful and lost more money than he could afford to lose, especially since he was already in debt. He felt that the way to recoup his losses was to continue his betting in the hope that his luck would change. He borrowed money from banks, loan companies and "loan sharks", and lost it all. In the first week of November, 1963, he lost his job. He then had outstanding, and overdue, debts of close to $3,000. He testified that he was being harassed by the banks and loan companies and threatened with physical harm by the "loan sharks" for not making payment. He decided that the only solution to his difficulties was to issue and cash checks on accounts in which he had insufficient funds, so that he could obtain the money he needed.

Respondent opened a checking account in one bank and proceeded to write and cash checks far in excess of the token amount he had deposited to open the account. By the end of the week, the checks started "bouncing", and he had already been threatened with criminal prosecution unless he made prompt restitution, by the manager of one of the stores he had victimized. His need for money became, if anything, even more pressing, and he knew that the bank, aware of his

3

activities, would not issue additional checks to him, so he proceeded to open two new checking accounts in two separate banks. He continued writing and cashing checks, passing a total of 50 or more before he was apprehended (there were a few on which charges were not brought against him). It appears, from respondent's testimony, that he had no organized or overall idea of what he intended to do when he started on this course of conduct, other than to get money, and that his actions were dictated by the needs of the moment:

I had a big burden of debts and I didn't know what to do, how to pay and I was threatened and so I opened a little checking account and then from a department store—a large department store, I wrote a check. I bought little articles from the check and I tried to pay some of it to the shylocks that would threaten me, so I gave them part of it and part of it I gambled with but I lost and then during this period of six weeks, I was writing checks trying to get some money to pay back and I heard the police were looking for me and then I was going to be thrown in jail, so I wrote the checks trying to get back to make money and pay the banks which I didn't want to put back $150 to the bank, Malden Trust Company, but I just couldn't put it back because I was losing the money and then they were looking for me and then the shylocks threatened me. So I gave them part of it and I went back and wrote more checks until December 21st. (Tr. p. 14)

The scope of the operation changed as it continued and his losses continued, and broadened to include the repayment of the monies he had obtained by the checkwriting, provided his luck changed:

I can gamble and make money if I can by getting lucky, and pay the whole thing that I wrote checks, including the bank and the department stores will say, well, he paid us, so that they don't have to prosecute me and if they do, at least I'll have the money to pay, because I have never been in trouble. I didn't even know the procedure of law how they excuse a person by paying or not paying, so I thought that I could pay them all and try to start all over again—you know—a better life because I was just so much peeved and they were after me and I said if I stop now, this minute, I will lose this much money, what am I going to do, so I wrote some more checks so, let me get lucky and maybe I can pay the rest that I wanted prior to my last check I wrote, to pay them all, the whole thing back, including the gambling places. (Tr. p. 29).

Is this, the writing of 48 worthless checks, on three different banks, the cashing of them in seventeen separate stores in eight different towns, in the period from November 7, 1963 to December 26, 1963, with use of the proceeds to make partial repayment on loans from "loan sharks", make token deposits in the newly opened bank accounts and make further bets on the races, a *single* scheme of criminal misconduct?

The wording of the statute itself and its legislative history are of no assistance in determining the meaning of this phrase, which saves from deportation certain persons who have been convicted of more than

4

one crime involving moral turpitude. The Board initially interpreted this exception to refer to acts which, although separate crimes in and of themselves, were performed in furtherance of a single criminal episode, as, for example, the possession and passing of a counterfeit bill, or an assault with a deadly weapon after breaking and entering a premises to commit larceny (see *Matter of D—*, 5 I. & N. Dec. 728; *Matter of Z—*, 6 I. & N. Dec. 167; *Matter of J—*, 6 I. & N. Dec. 382; *Matter of M—*, 7 I. & N. Dec. 144). We believe that this interpretation effectuates the basic purpose of the exception, which is contained in an overall provision aimed at simplifying the deportation of genuine multiple offenders. However, the wording has been variously interpreted by the courts of the several circuits and the matter has never been ruled on by the Supreme Court. The special inquiry officer, in his opinion, has carefully considered and discussed the reported decisions on this issue and their applicability to the instant case.

The deportation proceedings herein arise in the Second Circuit. On the District Court level, there is the case of *Jeronimo v. Murff*, 157 F. Supp. 808 (S.D.N.Y., 1957), where the alien was convicted of six counts of larceny and a count of conspiracy to defraud the City of New York by making false claims for labor and material on public contracts. The indictment read:

All of the acts and transactions alleged in each of the several counts in this indictment are connected together and constitute parts of a common scheme and plan.

The court, in holding that the various acts (committed over a two-year period) were part of a single scheme of criminal misconduct, leaned heavily on the language of the indictment, as well as the identity of victim and the fact that the same city employee had been dealt with in each instance. None of these factors is present in the instant case. Also on the District level is *Barrese v. Ryan*, 203 F. Supp. 880 (D.C. Conn., 1962), where the court ruled that the 63-year-old alien, who had first entered the United States in 1916, was not deportable for conviction of two counts of having failed to pay a $25 occupational tax required for the sale of liquor in connection with the operation of his restaurant in two successive years. The court held that the two convictions arose out of the continuing operation of the restaurant, and hence were a part of a single scheme of criminal misconduct. *Barrese*, too, is distinguishable from the instant matter.

There is question, however, as to whether *Jeronimo* and *Barrese* are controlling in the Second Circuit. In a later case, *Costello v. Immigration and Naturalization Service*, 311 F.2d 343 (1962), (reversed on other grounds, 376 U.S. 120), the Court of Appeals did not consider that conviction on two counts of income tax evasion for

5

two successive years came within a "single scheme of criminal misconduct". It specifically noted its disagreement with the holdings in *Jeronimo*, *Barrese* and cases in other circuits which relied on *Jeronimo*. In arriving at its decision, the court considered the legislative intent in creating the language of section 241(a)(4), and stated:

\* \* \* nor would it seem reasonable to suppose that the Congress intended to grant immunity from deportation to those who over a period of time pursued a course of criminal misconduct, involving numerous successive, separate crimes, consummated at different times but in the same manner, or with the same associates, or even by the use of the same fraudulent devices, disguises, tools or weapons. Nor in the case of successive bank robberies at different times and places, for example, would it seem that these could be said to have arisen out of a single, rather than two separate schemes of criminal misconduct, simply because the robbers, prior to the first robbery, had in mind and had discussed the robbery of the second bank after the hue and cry over the first robbery had subsided. After all, there is no denying the fact the Congress by the 1952 Act intended to make it easier rather than more difficult to deport aliens who were recurrent criminals.

Respondent bases his claim to the "single scheme" exemption upon the fact that for six weeks he "pursued a course of criminal misconduct, involving numerous successive, separate crimes, consummated at different times but in the same manner \* \* \*, by the use of the same fraudulent devices \* \* \*" for the sole purpose of paying off his debts. *Costello* rules out, as persuasive of a single scheme, the mere repetition over a period of time of the same criminal act on separate occasions. The special inquiry officer has given his attention to the weight to be accorded the claim of a single motivating purpose underlying all of the criminal acts. He points out that the object of most crimes is financial gain. He states:

Obviously, the existence of such a purpose is too broad a criterion with which to evaluate the existence of a single scheme. The least that would appear to be required is the existence of a purpose so definite and limited in scope, both as to amount and as to time, place and manner of execution, as to make it reasonably probable that the very crimes for which respondent stands convicted would be the ones which he would commit. (Opinion, p. 11).

We believe this to be a fair and valid standard to apply, one which can encompass the situation presented in *Wood* v. *Hoy, supra*, and prevent, at the same time, a blanket extension of the exception contained in the statute to any person who has the presence of mind to testify that he had a preconceived and single purpose in committing several criminal acts.

Respondent's activity, by his own testimony, does not meet the standard of definiteness and limited scope. His purpose initially was to get money so that he could gamble and win money to pay back his debts, but as his activities proceeded, his debts and creditors increased, the

pressures on him changed, and he engaged in a frantic sequence of robberies from Peter to pay Paul. His purpose was not being achieved but he continued hopeful, and changed locales and victims, knowing the police were after him but willing to lengthen his criminal record by each successive act until he should be stopped by being apprehended by the police. There is no evidence that he used any of the money so obtained for the alleged purpose for which he was stealing it, or that any of his debts were paid before the arrival of his mother from Lebanon, with money to make restitution. We cannot give serious consideration to the contention, on appeal, that because of "poor planning or unsatisfactory results" the unskilled criminal should be given the dispensation of "flexibility of action" to permit him to carry out his purpose, and still be considered to be within a single scheme (cf. brief, pp. 6–7).

We hold that deportability has been established, by the appropriate weight of evidence, that the special inquiry officer was correct in finding respondent statutorily ineligible both for suspension of deportation and voluntary departure, and that the appeal must therefore be dismissed.

**ORDER:** It is ordered that the appeal herein be and the same is hereby dismissed.

7